The MARIN CITY COUNCIL et al., Plaintiffs,

v.

The MARIN COUNTY REDEVELOP-MENT AGENCY et al., Defendants.

No. C–74–2225 AJZ.

United States District Court,
N. D. California.

Sept. 5, 1975.

See also, D.C., 416 F.Supp. 707.

Marilyn J. Berger, Legal Aid Society of Marin County, San Rafael, Cal., David B. Bryson, Richard M. Pearl, Cal. Rural Legal Assistance Cooperative Legal Services Center, San Francisco, Cal., for plaintiffs.

James L. Browning, Jr., U. S. Atty., James A. Bruen, Asst. U. S. Atty., San Francisco, Cal., for federal defendant Secretary of HUD; Timothy F. Winchester, Dept. of Housing and Urban Development, San Francisco, Cal., of counsel.

Cecil F. Poole, Jacobs, Sills & Coblentz, San Francisco, Cal., for defendants Highlands Associates, Eugene Ford, Mid-City Financial Corp., Shire West Corp.

Benjamin D. James, Jr., James & McGriff, San Francisco, Cal., William S. Hochman, Bagshaw, Martinelli, Corrigan & Jordan, San Rafael, Cal., for defendant Marin County Redevelopment Agency.

Douglas J. Maloney, County Counsel, County of Marin, San Rafael, Cal., for defendants Marin County Planning Commission and the County of Marin.

ORDER GRANTING IN PART DEFEND-
ANTS' MOTIONS TO DISMISS AND
FOR SUMMARY JUDGMENT

ZIRPOLI, District Judge.

This action involves a challenge to the construction of a housing development entitled Richardson Highlands on the remaining 36 acres of an urban renewal project, land which plaintiffs describe in their complaint as "the most attractive piece of developable land in the Western United States." The development is located in the hills above Marin City, an unincorporated area in Marin County, California. Plaintiffs contend

that the development should include subsidized low- and moderate-income housing because it is part of an urban redevelopment project. Plaintiffs are several residents of Marin City, its City Council and its Tenant Union. Defendants are the Secretary of Housing and Urban Development (HUD), the Marin County Redevelopment Agency (the Agency), the County of Marin and the developer, Highlands Associates (including its participating partners). The core of the dispute is the likely effect of the cost of the townhouses in Richardson Highlands ($47,000 to $57,000) on the racial composition of development—plaintiffs claim it will be virtually all white. By contrast, Marin City itself is 95 percent black. In their complaint, plaintiffs state eight causes of action. Defendants have moved to dismiss or for summary judgment against all eight causes of action. Having reviewed the extensive record of this case, the court concludes that defendants' motions should be granted as to all but two of plaintiffs' causes of action.

The court's review of the materials now in the record discloses the following history of the Marin City area. During World War II, the federal government built temporary housing in the Marin City area for shipworkers employed nearby. At one time the population of the area reached approximately 6,000, including approximately equal numbers of white and black residents. By 1955, the temporary housing had become delapidated and the population of the area had declined. The County became concerned about the area and established a Redevelopment Agency to improve it. In 1956 the Housing and Home Finance Administration (HHFA), HUD's predecessor, funded a feasibility study by the Agency of possible redevelopment of Marin City. The study included inquiry into the housing desires of the persons then residing in Marin City, and the Agency submitted a redevelopment plan to the HHFA. Based upon it, HHFA in 1958 apparently supplied the Agency with funds to purchase a 121 acre parcel of land in the Marin City area from the Marin County Housing Authority, which had acquired it from the federal government. This parcel became known as

Calif. R–8, apparently HUD's label for it. Later that year the Agency approved a redevelopment plan which HHFA also found acceptable, and the Agency and HHFA entered into a Loan and Capital Grant Contract under which the federal government agreed to finance the implementation of the plan. The contract has been amended several times since 1958, usually to increase the amount of money the federal government would contribute to the project.

Having obtained approval for its redevelopment plan, the Agency demolished all structures in Calif. R–8, including 640 units of temporary wartime housing and 305 other structures. At about the same time, the Housing Authority constructed 300 units of public housing on land immediately adjacent to Calif. R–8; all the people who had resided in the demolished structures and who wished to remain in Marin City apparently were relocated. Once the 121 acres of Calif. R–8 were cleared, the Agency made some improvements on it, such as streets and gutters, and entered into a contract with a developer which was to carry out the redevelopment plan and construct housing on the parcel. The developer constructed 192 units of low- and moderate-income housing on Calif. R–8 during the period between approximately 1962 and 1967. Meanwhile, the housing patterns in Marin County were operating to concentrate almost all black residents of the County in Marin City. The whites who had resided there tended to move to other parts of the county but the blacks, for financial and other reasons, were generally unable to find suitable housing in the County outside Marin City. Like other persons of modest means, they were caught in the squeeze of the housing shortage in the County. By the late 1960s nearly 95 percent of Marin City's 1,600 residents were black. All parties appear to concede that it is now a black ghetto.

The developer who had initially been engaged by the Agency stopped building housing in approximately 1967 and there was a three-year hiatus during which no further construction took place on Calif.

R–8. At that time, the land that remained to be developed consisted mainly of a 36 acre area on the hills behind and above Marin City; further construction on this area had been contemplated by the redevelopment plan. In 1970, both the developer and the Agency were apparently in default on their contract with HUD, and HUD contemplated terminating the project without developing these 36 acres. Instead, it appears that local officials at the HUD Regional Office in San Francisco decided to attempt to revitalize the project. See Fitzhugh Deposition at 46. Under this federal stimulus, the Agency began to solicit bids from other developers interested in the remaining 36 acres. Additionally, HUD and the Agency entered into the eighth amendatory contract to the original contract, which authorized the expenditure of further federal money.

One developer proposed using the remaining 36 acres for low- and moderate-income housing but HUD rejected this proposal because it had had prior unsatisfactory experiences with this developer. Additionally, in 1971, HUD decided that, under its Project Selection Criteria, 24 C.F.R. §§ 200.-700 et seq., no more subsidized housing would be approved for Calif. R–8 because it would tend to cause further racial "impaction." It is not clear what HUD grounded this decision upon, although it apparently was not the result of any protracted study. See Fitzhugh Deposition at 65; 68; 70. In 1972, the Agency received bids from a number of developers for the remaining 36 acres of Calif. R–8 and accepted the bid of Highlands Associates, which agreed to pay slightly over $1,000,000 for the 36 acres. Highlands proposed a two-phase development of these 36 acres, the first phase to consist of townhouses costing between $47,-000 and $57,000 apiece and the second to include expensive apartments and some "moderate income" housing. From the materials in the file, it appears that Highlands Associates may make efforts to distinguish the development, Richardson Highlands, from the remainder of Marin City because it views the proximity of Marin City's ghetto as an obstacle to selling the expensive townhouses it intends to build. Plaintiffs feel that such a development will serve only to increase the housing segregation in County and seek to compel Highlands to include low- and moderate-income housing in the development.[1]

■ At the outset, the court is met with challenges to its subject matter jurisdiction and to plaintiffs' standing to maintain this action. In particular, the Secretary contends that the court is without subject matter jurisdiction of the claims asserted against her. The court concludes that it does have jurisdiction of the claims as to which it does not grant defendants' motions for several reasons. First, given the court's administrative law approach to the case, it has jurisdiction under the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq., to review plaintiffs' challenges to HUD's 1971 decision to reject proposals of further subsidized housing in Calif. R–8. Second, since plaintiffs' challenges to the 1971 decision are premised at least in part on the Civil Rights Acts of 1964 and 1968, the court has original jurisdiction under 28 U.S.C. § 1343(4). Additionally, it appears to the court that it has jurisdiction under 28 U.S.C. § 1331 since the civil rights interests asserted by plaintiffs are, like constitutional rights, "almost by definition, worth more than $10,000." *CCCO–Western Region v. Fellows*, 359 F.Supp. 644, 647–48 (N.D.Calif. 1972); *Cortright v. Resor*, 325 F.Supp. 797 (E.D.N.Y.1971); see *Spock v. David*, 469 F.2d 1047 (3d Cir. 1972). Finally, since plaintiffs have asserted cognizable federal claims against the nonfederal defendants, it appears to the court that the federal claims they have against the Secretary should properly be considered pendent to the claims against the nonfederal defendants. Compare *Princess Cruises Corp. v. Bayly, Martin & Fay, Inc.*, 373 F.Supp. 762 (N.D.

---

1. It is worth noting that Highlands is apparently not adamantly opposed to including low- and medium-income housing inside Richardson Highlands. Instead, it seems that the prime obstacle to such a plan is HUD's determination that no such subsidized housing should be approved in view of the proximity of the Marin City ghetto.

Calif.1974); *contra, Aldinger v. Howard,* 513 F.2d 1257 (9th Cir. 1975).

On the standing issue, both plaintiffs and defendants rely on *Norwalk CORE v. Norwalk Redevel. Agency,* 395 F.2d 920 (2d Cir. 1968). Plaintiffs there were minority persons displaced by urban renewal who challenged the agency's relocation practices, contending that they were administered in a discriminatory fashion designed to drive minority persons out of the community. The court reasoned that standing should be assessed on a case-by-case basis looking to plaintiffs' interest in the outcome of the case and to whether the issues raised were justiciable. It held that the plaintiffs before it had standing:

> Their stake in the outcome of the case is immediate and personal, and the right which they allege has been violated—the right not to be subjected to racial discrimination in government programs—is one which the courts will protect.

*Id.* at 927. Similarly here, the individual plaintiffs have a substantial stake in the outcome of this lawsuit for they assert that Richardson Highlands will affect "the very quality of their daily lives." *Shannon v. United States Dep't of Housing & Urban Devel.,* 436 F.2d 809, 818 (3d Cir. 1970). Their claim that the exclusion of low- and moderate-income housing from the development is arbitrary and contrary to the Civil Rights Acts is justiciable. The organization plaintiffs may sue on behalf of their members, who are affected by defendants' actions. See *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Defendants have suggested that *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), compels the conclusion that plaintiffs do not have standing, but the court feels that its reasoning is not applicable to this case because plaintiffs here are concerned with a particular housing project. See 507–508, 95 S.Ct. 2209–2210; *Construction Indus. Assoc. of Sonoma County v. City of Petaluma,* 522 F.2d 897, 905 (9th Cir., August 13, 1975). Hence plaintiffs have standing to maintain this action.

As the court reads the complaint, the heart of the lawsuit from plaintiffs' point of view is a challenge to the 1971 decision by HUD not to approve any more subsidized housing for the Calif. R–8 project. It appears further to the court that its proper role in reviewing this decision is basically to apply principles of administrative law to it. See Casenote, *HUD Has Affirmative Duty to Consider Low Income Housing's Impact on Racial Concentration,* 85 Harv.L.Rev. 870, 877–78 (1972). The core of the complaint, then, is contained in the fourth and fifth causes of action. Both of these rely on the Fifth Amendment, the Civil Rights Act of 1964, and the Civil Rights Act of 1968. Title VI provides that

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. Title VIII, the 1968 Civil Rights Act, provides that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. It proclaims further that "[t]he Secretary of Housing and Urban Development shall administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." *Id.* § 3608(d)(5). In plaintiffs' view, HUD has violated its statutory and constitutional mandate by deciding to reject subsidized housing in Calif. R–8 on the ground that it will be occupied by blacks (the fourth cause of action) and by failing to establish an adequate procedure to evaluate the proposed development's "impaction" of the area before making the challenged decision (the fifth cause of action).

It appears to the court that HUD has "an obligation to act affirmatively to achieve integration in housing." *Otero v. New York City Housing Authority,* 484 F.2d 1122, 1133 (2d Cir. 1973). As set out in *Shannon v. United States Dep't of Housing & Urban Devel., supra,* HUD must therefore give consideration to "[i]ncrease or maintenance of racial concentration [be-

cause it] is prima facie likely to lead to urban blight and is thus *prima facie* at variance with the national housing policy." 436 F.2d at 821. The *Shannon* court held that HUD should develop "some institutionalized method whereby, in considering site selection or type selection, it has before it the relevant racial and socioeconomic information necessary for compliance with its duties under the 1964 and 1968 Civil Rights Acts." *Id.* In response to *Shannon,* HUD promulgated regulations to make the priority of any given project turn in part on whether it would lead to further racial "impaction," known as the Project Selection Criteria. See 24 C.F.R. §§ 200.700 *et seq.*

In 1971 HUD determined, in reliance on the Project Selection Criteria, that further subsidized housing in Calif. R–8 should receive a rating of "poor" because it would further "impact" the Marin City area, which already had a black population of approximately 95 percent. Plaintiffs attack this decision on two theories. First, they contend that since the decision was based on racial grounds, the Fifth Amendment requires that it be justified by a compelling state reason, which they claim does not appear. The court cannot agree that the requirements of the Civil Rights Acts conflict with the Fifth Amendment, and plaintiffs themselves appear to recognize that they do not when they

> agree that racial impaction is undesirable and that national policy should seek to avoid racial impaction. Plaintiffs in no way argue that any danger of racial impaction in Richardson Highlands should be ignored. Plaintiffs only argue that HUD, in its new found zeal to avoid racial impaction, has far exceeded the limits of its authority by irrationally prohibiting even a fraction of the housing in Richardson Highlands to be subsidized.

Plaintiffs' memorandum of June 27, 1975, at 16. Thus, plaintiffs are not attacking the Project Selection Criteria on their face as violative of the Fifth Amendment, but only as applied to this project.

Approached in this light, plaintiffs' fourth and fifth causes of action raise two issues of administrative law: (1) were the procedures employed in deciding to reject subsidized housing for Richardson Highlands an "adequate institutional means for marshaling the appropriate legislative facts," *Shannon, supra,* 436 F.2d at 821;[2] (2) if the procedure employed was adequate, whether the decision reached was nevertheless so irrational as to offend against the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Plaintiffs contend that given the intentional separation of Richardson Highlands and the remainder of the Marin City area by Highlands, HUD could not rationally consider the racial makeup of the present Marin City relevant to inclusion of subsidized housing in Richardson Highlands. Defendants argue that the Project Selection Criteria are an adequate institutionalized means of assessing racial "impaction" and that the line-drawing involved in applying them to Marin City is an activity committed to agency discretion. The court feels that these issues are not ripe for summary judgment. Since plaintiffs are not attacking the Project Selection Criteria on their face, defendants' general protestations about the adequacy of the criteria do not avail them much since the record is still rather cloudy about what procedure was employed in applying the criteria to Marin City. It is true that HUD has great flexibility in setting up such procedures, but the court must know more about their application here before assessing that. Similarly, the court finds that the present record, and the memoranda of the parties, do not adequately address the plaintiffs' challenge to

---

**2.** It is worth noting that the court in *Shannon* left the procedure ill-defined to allow HUD to develop an adequate procedure. HUD argues here that no investigative procedure is required where the decision involved is *not* to provide subsidized housing, as opposed to an affirmative decision that such housing should be located at a particular site. Since it concludes that

the record is not presently sufficiently clear about the procedure that was in fact employed here, the court need not reach this argument. It notes, however, that a less elaborate procedure may well be sufficient for decisions that are likely to have less dramatic consequences, such as a decision not to create a subsidized housing project.

the rationality of HUD's decision. HUD is not deprived of its broad discretion merely because its actions are subjected to judicial scrutiny; a further examination of the procedure employed to evaluate the racial "impaction" of the Marin City area may well demonstrate that the 1971 decision was well founded. At present, however, the court denies the motions for summary judgment directed at the fourth and fifth causes of action.

■ Plaintiffs assert three other federal causes of action; defendants' motions directed to these causes of action are well taken. The third claim is based on the Housing Act of 1949, as amended, which requires that:

A majority of the housing units provided in each community's total of such approved urban renewal projects as will be redeveloped for predominantly residential uses and which receive Federal recognition after August 1, 1968, shall be standard housing units for low and moderate income families or individuals.

42 U.S.C. § 1455(f). Plaintiffs contend that once both phases of Richardson Highlands are completed the units in the development will outnumber the 192 units of subsidized housing already constructed on Calif. R–8, thus violating the statute. But this provision applies only to projects "which receive Federal recognition after August 1, 1968" and this project received such recognition from HHFA in 1958. Plaintiffs urge that summary judgment on this ground is not proper now because there remains a genuine dispute as to when federal recognition occurred in view of the amendment of the original contract on two occasions after 1968, and the post-1968 determination by HUD not to terminate the project uncompleted. The court, having reviewed the materials presently before it, rejects plaintiffs' argument because it appears clear that such recognition, for purposes of this statute, occurred long before 1968. It therefore grants the motions for summary judgment against the third cause of action.

■ The seventh cause of action relies on the National Environmental Policy Act, 42 U.S.C. § 4332, and asserts that defendants should not be permitted to proceed with the project until they have prepared an environmental impact statement. But the Act applies only as to "major federal actions" after January 1, 1970. 42 U.S.C. § 4332(2)(c). Plaintiffs rely on much the same factual matter to support their claim that there has been major federal action since 1970 as they do in support of their contention that their third cause of action is viable because there had been federal recognition after 1968. The court rejects their arguments. It is abundantly clear that plaintiffs' concerns are materially different from those that motivated Congress to enact NEPA for the Act is not concerned with the sociological effects of federal actions. See *Maryland National Capital Park & Planning Comm'n v. United States Postal Serv.,* 159 U.S.App.D.C. 158, 487 F.2d 1029, 1037 (1973); *Nucleus of Chicago Homeowners Ass'n v. Lynn,* 372 F.Supp. 147, 149 (N.D.Ill.1973). But plaintiffs' concern is precisely sociological: it is not that they want to limit the impact of Richardson Highlands upon the natural environment of Marin County but that they wish to be included in the development. Since the original redevelopment plan approved in 1958 contemplated residential development of the 36 acres upon which Richardson Highlands is supposed to be built, the approval of the eighth amendatory contract in 1972 did not materially affect the impact of the plan on the concerns behind the Act and should not be considered major federal action under the Act. See *San Francisco Tomorrow v. Romney,* 472 F.2d 1021 (9th Cir. 1973). The court therefore grants defendants' motions for summary judgment as to the seventh cause of action.

The eighth cause of action relies on defendants' claimed failure to consult with the Project Action Committee, a group of residents of Marin City set up under the auspices of HUD's Urban Renewal Handbook. But that Handbook requires such groups only where the project is designed to do residential rehabilitation and the court is persuaded plaintiffs have stated no cause of

action for defendants' alleged disregard of this body. Their motion to dismiss the eighth cause of action is therefore granted. The court notes, however, that it may be that defendants' treatment of the Project Action Committee arguably bears on the question of whether they employed an adequate procedure to assess the issue of racial "impaction."

██ Finally, plaintiffs assert three causes of action based on state law. The first and second causes of action rely on sections 33037, 33071 and 34201 of the California Health & Safety Code and allege in essence that defendants improperly allowed public moneys to be expended in a way that would not "benefit the residents" of the urban renewal area. The sixth cause of action relies on Marin County Ordinance No. 1996, which amended the Marin City Master Plan to require that "enough" low-income housing be constructed in Marin City. Plaintiffs claim that the development of Richardson Highlands without any such housing violates the ordinance. Plaintiffs believe that these claims are pendent to the federal claims they have asserted. The court concludes that they are not truly pendent to the federal claims that remain, which relate to HUD's 1971 decision not to approve subsidized housing in Richardson Highlands. To be pendent, these state law claims would have to derive from a common nucleus of operative facts and law. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). But the state law claims revolve around quite separate factual issues concerning the conduct of state officials under state law and may involve difficult and novel problems of state law. The court therefore grants defendants' motion to dismiss them on the ground that it has no subject matter jurisdiction over them because they are beyond its pendent jurisdiction and it need not reach defendants' substantive challenges to the state law claims.

IT IS THEREFORE ORDERED that defendants' motions to dismiss the first, second, sixth and eighth causes of action are granted.

IT IS FURTHER ORDERED that defendants' motions for summary judgment against the third and seventh causes of action are granted.

IT IS FURTHER ORDERED that defendants' motions for summary judgment against the fourth and fifth causes of action are denied.