NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE et al., Plaintiffs,

v.

The WILMINGTON MEDICAL CENTER, INC., et al., Defendants.

Civ. A. No. 76–298.

United States District Court, D. Delaware.

Jan. 19, 1977.

Joseph S. Flowers, Wilmington, Del., Marilyn G. Rose and Christine B. Hickman, Center for Law and Social Policy, Washington, D.C., and Aida Waserstein and Douglas Shachtman, Community Legal Aid Society, Inc., Wilmington, Del., for plaintiffs.

Charles H. Toliver, IV, and Alan Bernard Scher, Asst. City Sols., Wilmington, Del., for plaintiff-intervenor.

Rodney M. Layton, Wendell Fenton and William J. Wade of Richards, Layton & Finger, Wilmington, Del., for defendants The Wilmington Medical Center, Inc., Crawford H. Greenewalt and Joseph A. Dallas.

W. Laird Stabler, Jr., U.S. Atty., Wilmington, Del., Rex E. Lee, Asst. Atty. Gen., David J. Anderson, Dennis G. Linder, and Rebecca L. Ross, Trial Attys., Dept. of Justice, Washington, D.C., Stephanie W. Naidoff, Regional Atty., and Diane C. Moskal, Asst. Regional Atty., Dept. of Health, Education and Welfare, Philadelphia, Pa., for defendant David Mathews, Secretary of Health, Education and Welfare.

Malcolm S. Cobin, Asst. Atty. Gen., Dept. of Justice, Dover, Del., for defendant Amos Burke, Director of the Bureau of Comprehensive Health Planning.

William C. Gordon, pro se.

## MEMORANDUM OPINION

LATCHUM, Chief Judge.

Defendant Wilmington Medical Center, Inc. ("WMC") provides most of the hospital facilities for New Castle County, Delaware. Its operations center around three hospitals located within the City of Wilmington—the General Division, the Memorial Division,

and the Delaware Division.[1] After an extensive planning effort, WMC concluded that a massive capital expenditure program was required in order to supply the quality and level of care that it thought necessary. The final proposal, labeled Plan Omega, involves the renovation of the Delaware Division, the closing of the Memorial and General Divisions, and the construction of a new 60 million dollar, 800 bed tertiary care facility in suburban Stanton, Delaware approximately 8 miles southwest of Wilmington.[2]

This suit was filed in September, 1976, roughly one month before WMC planned to issue construction bonds to generate the funds for the new facility. As a result of this litigation, WMC's efforts to market its bonds and to commence construction have been thwarted. It is anticipated that the cost of Plan Omega will increase substantially each month that construction is forestalled by the pendency of this suit. In recognition of the burden caused by any delay, the parties have made substantial efforts to expedite the course of this litigation.

Implementation of Plan Omega is challenged by several civic and religious organizations and by several individuals[3] who allege that Plan Omega will discriminate against the poor, the elderly, ethnic and racial minorities, and the handicapped. The plaintiffs[4] fear that construction of a large, modern suburban hospital will lead to the creation of a dual hospital system. The Stanton hospital, it is alleged, will serve the white, relatively affluent population of suburban New Castle County, while the one WMC facility remaining in Wilmington will serve primarily the poor, the elderly, blacks and Puerto Ricans, and the handicapped. The plaintiffs predict an eventual deterioration of the quality of care at the Delaware Division. Furthermore, they argue removal of certain services to the suburban hospital will make them inaccessible to many residents of Wilmington and northern New Castle County. In short, plaintiffs assert that Plan Omega violates Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"), and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("§ 504"). WMC, however, vigorously denies that any discriminatory effect will result from Plan Omega.

In the spring of 1976 WMC sought approval of Plan Omega under § 1122 of the Social Security Act, 42 U.S.C. § 1320a–1 ("§ 1122") by the defendant Secretary of Health, Education and Welfare (the "Secretary"). The significance of § 1122 approval reflects the narrow Congressional purpose of encouraging state and local health planning efforts. In essence, § 1122 certification before construction merely assures WMC that the Secretary will not later withhold federal funds under medicare,[5] medicaid,[6] and programs for maternal and child health services[7] because the capital component of the hospital charges is the result of an unnecessary capital expenditure. If WMC had not applied for § 1122 approval or if its § 1122 application had been rejected, it simply ran the risk of not being fully reimbursed for services provided to federally assisted patients.[8]

1. In addition to WMC which has 994 beds in the three named divisions, two smaller hospitals in Wilmington have a combined capacity of 282 beds. (Docket Item 53A, Ex. 2.)

2. After renovation, the capacity of the Delaware Division will be 250 beds. (Docket Item 53A, Ex. 2). The projected total cost of Plan Omega is 88 million dollars.

3. Class action certification has been granted. (Docket Item 30).

4. The City of Wilmington has been permitted to intervene as a plaintiff. (Docket Item 11).

5. 42 U.S.C. § 1395.

6. 42 U.S.C. § 1396.

7. 42 U.S.C. § 701 et seq.

8. However, WMC evidently had decided that it would not pursue Plan Omega until it received the Secretary's blessings.

The studies to determine the need for the expenditures envisioned by Plan Omega were carried out under federally funded contracts by a local health planning group, the defendant Health Planning Council, Inc. ("HPC") and review by a state agency, the defendant Bureau of Comprehensive Health Planning ("BCHP"). HPC approved Plan Omega on June 3, 1976; BCHP's favorable consideration was completed by June 15, 1976; the Secretary issued § 1122 approval on August 6, 1976.[9]

Plaintiffs contend that, although no federal funds flow immediately to WMC in support of Plan Omega, § 1122 certification is tantamount to approval of massive federal support for the operation of the new hospital under the guise of federal medical assistance programs. Thus, they charge that the Secretary has violated his duties under Title VI and § 504 by, in effect, approving a hospital relocation program that will discriminate against minorities and the handicapped. The plaintiffs also argue that BCHP and HCP are subject to requirements of Title VI and § 504 because both groups received federal funds to perform their § 1122 duties and because federal contracts such as those involving state and local planning agencies under § 1122 implicitly impose Title VI and § 504 duties.

The Secretary has filed a motion to dismiss or, alternatively, for summary judgment,[10] and BCHP has moved to dismiss.[11] In response, the plaintiffs have moved for partial summary judgment against the Secretary.[12]

■ The complexity of the issues and social concerns implicated in this litigation has frustrated efforts to focus on the immediate and critical questions raised by these motions. Congress enacted § 1122

"to assure that medicare, medicaid, and the maternal and child health programs are consistent with State and local health

facility planning efforts, in order to avoid paying higher costs unnecessarily in the future where these costs result from duplication or irrational growth of health care facilities." 1972 U.S.Code Cong. & Adm.News p. 5065.

Therefore, it appears that the legislative purpose behind § 1122 was limited and specific. The threatened reduction of federal financial assistance was viewed as adequate incentive to discourage efforts to make wasteful expenditures for health care facilities. Also, the express prohibition on judicial review of the Secretary's decision set forth in § 1122(f) indicates the desire of Congress to avoid creating another vehicle for the intervention of federal courts in the planning efforts of local and state health officials.

■ On the other hand, Title VI and § 504 were designed to eliminate discrimination against minorities and the handicapped in programs receiving federal financial assistance.[13] E.g., Joy v. Daniels, 479 F.2d 1236, 1240–41 (C.A. 4, 1973). Furthermore, it is clear that anti-discrimination statutes have a significant impact on all federal financial assistance programs. Shannon v. HUD, 436 F.2d 809, 817 (C.A. 3, 1970).

This somewhat simplistic overview of statutory entanglement is necessary to understand the various views of the parties toward this litigation. No party suggests that WMC can select a site for a new hospital which will have the effect of discriminating against minorities or the handicapped. In stead, much commotion has been raised over the proper method of determining whether construction of the Stanton facility will have discriminatory consequences. The Secretary has indicated concern that the plaintiffs are seeking to require Title VI and § 504 compliance studies whenever a § 1122 approval is sought. The plaintiffs,

9. Affidavit of O. Eugene Trivits, Docket Item 23.

10. Docket Item 23.

11. Docket Item 9.

12. Docket Item 53.

13. Approximately 35% of WMC's current operating revenue comes from federal sources. (Docket Item 53A, Ex. 2; Docket Item 20, Ex. S–16; Docket Items 1 & 5, par. 5).

however, appear to be more interested in obtaining Title VI and § 504 compliance reviews when a site relocation is involved in a § 1122 application. Through the smoke of the battle between plaintiffs and the Secretary, which obviously has far-ranging significance, WMC asserts that Plan Omega will not have a discriminatory effect on either minorities or the handicapped.

Thus, the Court is confronted with two separate, but closely related, questions. The first question involves whether Plan Omega will have a discriminatory impact; the second question requires a detailed consideration of the relationship between § 1122 and Title VI and § 504. The need for prompt resolution of the first question is readily apparent. If the Stanton hospital will eventually be built, minimization of cost is a goal which all parties can support. If the Stanton hospital will not be built because of a finding of discriminatory effect, alternate solutions may then be quickly developed because it appears that at least two of WMC's three hospitals are running some risk of loss of accreditation.[14] The broader, second question, which deserves full consideration and timely disposition, does not warrant an expedited review and deserves mature reflection on the consequences and ramifications of any decision by the Court. Accordingly, it is the Court's view that the issues directly related to Plan Omega must be resolved separately.

 The Secretary and the BCHP argue that this suit must be dismissed because plaintiffs have failed to exhaust their administrative remedies.[15] The Secretary's regulations, 45 CFR § 80.7, detail a procedure by which a party alleging a violation of Title VI may file a complaint with the Secretary. No similar regulations have yet been implemented for effectuating the rights guaranteed by § 504. As a general matter, the failure to seek administrative redress of Title VI and § 504 grievances

would require dismissal of a suit brought under Title VI and § 504 in a federal court. *Green Street Association v. Daley*, 373 F.2d 1, 8–9 (C.A. 7, 1967), *cert. denied*, 387 U.S. 932, 87 S.Ct. 2054, 18 L.Ed.2d 995 (1967); *Johnson v. County of Chester*, 413 F.Supp. 1299, 1310–11 (E.D.Pa.1976); *Green v. Cauthen*, 379 F.Supp. 361, 378–79 (D.S.C.1974); *Feliciano v. Romney*, 363 F.Supp. 656, 672–73 (S.D.N.Y.1973); *Dupree v. City of Chattanooga*, 362 F.Supp. 1136, 1141–42 (E.D. Tenn.1973). However, the Secretary's regulations require that a Title VI investigation be conducted "whenever a compliance review, report, complaint, or *any other information* indicates a possible failure to comply with [the Secretary's Title VI regulations]." 45 CFR § 80.7(c). (Emphasis added). Clearly, when the Secretary was served with the complaint filed in September, 1976 in this court, he received "information" which suggested a possible violation of Title VI. Nevertheless, believing that any complaint should be filed directly with him, the Secretary has not acted in any meaningful way on the information which came to his attention.[16] The Secretary, however, is bound by his own regulations, and a fair reading of them convinces the Court that he had received sufficient "information" to initiate an investigation.

 Furthermore, the plaintiffs have argued that their efforts to seek administrative review of their claim against WMC would have been futile. To support this contention, they have created a record indicating that the Secretary lacks the personnel resources to process Title VI and § 504 complaints.[17] The Secretary, however, has represented to the Court through his counsel that he does have the capability of performing Title VI and § 504 reviews. If it were clear that the Secretary could not or would not have acted on plaintiffs' complaint, the exhaustion of administrative

---

14. Docket Item 72, p. 71.

15. No administrative complaint has been filed with the Secretary. (Affidavit of Dewey E. Dodds, Docket Item 23).

16. Docket Item 63, p. 86.

17. *E. g.*, Docket Item 62, pp. 59–61; Docket Item 63, p. 93.

remedies would not have been required. *See, e. g., American Federation of Government Employees v. Acree*, 155 U.S.App.D.C. 20, 475 F.2d 1289, 1292 (1973). The Court, however, on the present record is unwilling to conclude that the Secretary will not perform his duties with respect to Plan Omega. Permitting the Secretary to develop the factual record on plaintiffs' complaint and to exercise his discretion will carry out the Congressional expectation that Title VI be administered by the appropriate agency and that judicial review of the agency's decision follow traditional paths. 42 U.S.C. §§ 2000d–1, 2000d–2. *See Parisi v. Davidson*, 405 U.S. 34, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972); *McKart v. United States*, 395 U.S. 185, 193–95, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969).[18] In sum, the Court will direct the Secretary to determine whether Plan Omega violates Title VI or § 504.[19] *Cf. Hall v. United States Civil Service*, 174 U.S.App. D.C. 468, 533 F.2d 695, 698 (1976). In view of the grave doubt created by plaintiffs over the Secretary's capability to perform the appropriate review, the Secretary will be requested to submit, for the Court's consideration, a detailed plan for processing plaintiffs' complaint and an estimate of the period of time required to carry out the plan. If it later appears that the Secretary is unable or unwilling to conduct his review in a timely fashion, recognizing the cost of any unnecessary delay in the implementation of Plan Omega, the Court may find that exhaustion of administrative remedies would be futile and proceed to consider the Title VI and § 504 allegations without the benefit of an administrative record.

Furthermore, according to the plaintiffs, when the Secretary failed to prepare an environmental impact statement before issuing § 1122 approval for Plan Omega, he violated § 102(2)(C) of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4332(2)(C), which directs the preparation of environmental impact statements for "major Federal actions significantly affecting the quality of the human environment." Apparently, without having seriously considered the application of NEPA to the § 1122 program, the Secretary has concluded that an environmental impact statement is never needed during § 1122 review. First, he points to the limited Congressional purpose behind § 1122 and argues that no major federal action is involved in the § 1122 program. Second, he contends that no environmental consequences within the ambit of NEPA flow from § 1122 approval.

Although it is not now possible to predict accurately the amount of federal financial assistance that the Stanton hospital will receive, it is obvious, that as an almost inevitable consequence of § 1122 approval, a large portion of the cost of Plan Omega will be borne eventually by the federal government through payment to WMC for services provided medicare, medicaid, and maternal and child health program patients.[20] Indeed, without § 1122 approval and the

---

**18.** Consideration of plaintiffs' Title VI claim by the Secretary is especially appropriate because the alleged conduct is specifically proscribed by the Secretary's regulations:

"In determining the site or location of a facilities, an applicant or recipient may not make selections with the effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination under any programs to which this regulation applies, on the ground of race, color, or national origin; or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the Act [Title VI] or this regulation."

45 CFR § 80.3(b)(3).

**19.** If the Court holds later that the Secretary is required to initiate Title VI and § 504 investiga-

tions upon receipt of a § 1122 application involving site selection, the course chosen by the Court will have preserved the plaintiffs' right to Title VI and § 504 compliance by WMC without having unduly delayed resolution of the basic issues involving WMC. In addition, remedying any violation of Title VI or § 504 inevitably would be more difficult after construction.

**20.** Plaintiffs have estimated that WMC will receive initially $3,000,000 per year in capital reimbursement and will continue to receive capital reimbursement for perhaps thirty years after the Stanton hospital is opened. (Docket Item 53, par. C–13).

reasonable expectation of substantial funding after the Stanton hospital begins accepting patients, it is fair to conclude that Plan Omega would never have been undertaken.[21] The significance of this federal funding is heightened when it is recognized that the Secretary routinely prepares environmental impact statements on hospital construction projects directly funded by the federal government.[22] Thus, whether the degree and importance of likely federal support for Plan Omega constitutes "major Federal action" is a question which deserves specific consideration by the Secretary.

Similarly, the dislocation arising out of the closing of two inner-city hospitals and the transfer of many hospital services to a fairly distant suburban area might fall within the scope of the Secretary's environmental concerns. For example, the Secretary has determined that a project's impact on access to health care is a relevant criterion for establishing the necessity of an environmental impact statement[23] and plaintiffs have alleged that implementation of Plan Omega will hinder the efforts of many Wilmington residents to obtain hospital care.

The Secretary has developed elaborate procedures for deciding when an environmental impact study must be conducted.[24] Instead of absolutely declaring that NEPA can never have any effect on the § 1122 program, the Secretary should review the applicability of his standards to § 1122 approval of Plan Omega which, most likely,

eventually will be the beneficiary of substantial federal funding over the long run and which will result in the transfer of important health care services from the inner-city to the suburbs.

Accordingly, in light of the further consideration required of the Secretary on the Title VI and § 504 aspects of Plan Omega, the Court will also direct the Secretary to reconsider his position that NEPA can have no impact on his approval of Plan Omega.[25]

### ON MOTION TO DISMISS

■■ Defendant Amos Burke, Director of the State of Delaware's Bureau of Comprehensive Health Planning has moved to dismiss the claim of the plaintiff-intervenor City of Wilmington (the "City") against him on the ground that the City cannot sue the State of Delaware, its agencies, or officers in their official capacities (the "State"). The narrow question presented to the Court is whether the City has the capacity to sue the State.[1]

■ The capacity of the City, a municipal corporation, to sue the State must be determined by reference to Delaware law. Rule 17(b), F.R.Civ.P.

■ Delaware's Home Rule Statute, 22 Del.C. ch. 8, provides in part:

"Every municipal corporation in this State containing a population of a least 1,000 persons . . . may . . . amend its charter so as to have and as-

21. Docket Item 72, p. 69.

22. Docket Item 42, No. 17(a). It also appears that construction of hospitals when the only immediate federal involvement is the issuance of federal mortgage insurance is regularly preceded by the preparation of an environmental impact statement.

23. Docket Item 42A, Exs. M & N.

24. Docket Item 42A, Ex. N.

25. Nothing in this opinion should be interpreted as an expression of the Court's position on the necessity of an environmental impact study on Plan Omega.

1. When the City moved to intervene of right as plaintiff, no objection was made by any party.

A putative intervenor of right need not show an independent basis of federal court jurisdiction in order to intervene. 3B Moore's Federal Practice ¶ 24.18. Thus, it should be emphasized that standing as a constitutional limitation of federal court jurisdiction is not implicated by defendant Burke's motion. *See Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *but cf. Athanson v. Grasso*, 411 F.Supp. 1153 (D.Conn.1976) (municipality lacks standing but not capacity to sue state).

Furthermore, although a municipal corporation such as the City may not invoke the Fourteenth Amendment against its creator, the State, *Williams v. Mayor*, 289 U.S. 36, 40, 53 S.Ct. 431, 77 L.Ed. 1015 (1933), the City seeks to assert rights only under federal statute and not under the Fourteenth Amendment.

sume all powers which, under the Constitution of this State, it would be competent for the General Assembly to grant by specific enumeration and which are not denied by statute." 22 Del.C. § 802. The purpose of the home rule provisions was to enable municipalities to exercise the powers of the sovereign except as limited by either the State Constitution or State statute. *Gage v. City of Wilmington*, 293 A.2d 555 (Del.Supr.1972); *City of Wilmington v. Lord*, 340 A.2d 182 (Del.Super.1975).

The Charter of the City, enacted in response to the Home Rule Statute, reads in pertinent part:

"Pursuant to Title 22, Del.C., 1953, Ch. 8 . . . the City shall have and exercise all express and implied powers and authority of local self-government and home rule, which, under the Delaware Constitution, it would be competent for the General Assembly to grant the City by specific enumeration and which are not denied by general statute and the City shall have complete powers of legislation and administration in relation to its municipal functions, including any additional powers and authority which may hereafter be granted to it." Wilmington Home Rule Charter, § 1–101.[2]

Thus, the City has accepted all powers which it could have obtained under the Home Rule Statute.

 Nothing has been found in either the Delaware Constitution or the Delaware Code which would prohibit the City from seeking equitable relief against the State. It seems plain that the General Assembly could have expressly permitted the City to file an *action such as this one*. The broad delegation of the Home Rule Statute, the definite intent of the City to assume all powers within its reach, and the absence of any relevant limitation on the City's power to sue in either the Delaware Constitution or the Delaware Code persuade the Court

that the City has the capacity to sue the State. *See* 17 McQuillin, Municipal Corporations § 49.04.

---

**2.** The explanation accompanying the original draft of the Charter makes clear that assumption of all possible powers was intended by the drafters:

"The powers of the City are stated in the broadest terms to assure the fullest possible benefits of home rule as intended by the General Assembly and to this end specification of powers is avoided."