Viviana MUNOZ–MENDOZA, Maggie Morris, Arturo Juarbe, Pat Quintana, Marcia Wiley, Bruno Rodriguez, Kam Yun Lee, and The Chinatown Housing and Land Development Task Force, Individually and on Behalf of all others Similarly Situated, et al., Plaintiffs,

v.

Samuel R. PIERCE, in his Official Capacity as Secretary, Department of Housing and Urban Development, Robert C. Embry, in his Official Capacity as Assistant Secretary for Community Planning and Development, Marvin Siflinger, in his Official Capacity as Area Manager, Boston Area Office of the Department of Housing and Urban Development, Robert Pacquin, in his Capacity as Area Director of Community Planning and Management in the Boston Area Office, Kevin H. White, in his Capacity as Mayor of the City of Boston, and Robert Ryan, in his Official Capacity as Executive Director of the Boston Redevelopment Authority, Defendants.

Civ. A. No. 80–2589–C.

United States District Court, D. Massachusetts.

Aug. 17, 1981.

Albert W. Wallis, Greater Boston Legal Services, Laura Monroe, Greater Boston El-derly Legal Services, Frank I. Smizik, Mass. Law Reform Institute, Boston, Mass., for plaintiffs.

Marcia Drake Seeler, Asst. Corp. Counsel, Boston, Mass., for defendants White and Ryan.

Keith M. Werhan, Andrew M. Wolfe, Civ. Div. Dept. of Justice, Washington, D. C., for defendant Landrieu.

Keith M. Werhan, Washington, D. C., for all remaining defendants.

## MEMORANDUM

CAFFREY, Chief Judge.

Plaintiffs, seven individuals and an unincorporated organization, the Chinatown Housing and Land Development Task Force, are before the Court challenging federal funding for the development of a project known as "Copley Place." The plaintiffs, seeking declaratory and injunctive relief, sue the Secretary of the Department of Housing and Urban Development (HUD) and other federal officials, as well as two officials of the City of Boston, claiming that the award by HUD of a $18.85 million Urban Development Action Grant (UDAG) was not preceded by adequate planning and will have a discriminatory impact on low-income residents of Boston's South End, in violation of civil rights laws (Title VI, 42 U.S.C. § 2000d et seq. and Title VIII, 42 U.S.C. § 3601 et seq.). Cross-motions for summary judgment have been briefed and argued.

Copley Place is a $318 million multi-use development which will include a 712–room luxury hotel, a 960–room convention hotel, a retail center, office space, enclosed parking and 100–150 units of housing, 25% of which are to be subsidized. The site for Copley Place is 9.5 acres of vacant land, cleared 16 years ago for construction of the Massachusetts Turnpike extension. There is no presently existing residential housing located anywhere on the 9.5 acre tract. The tract, bordering the South End, Fenway and Back Bay neighborhoods, has remained undeveloped except for several exit ramps and a rail line located in the center

of the site. All of the plaintiffs live in neighborhoods close to the project site. The South End is a fully integrated residential area.

In April of 1980 the City of Boston submitted to HUD a UDAG application for Copley Place, and HUD announced preliminary approval of the funding on October 9, 1980. The Chinatown Housing and Land Development Task Force and one other organization filed an administrative complaint with HUD in June 1980 expressing concern over the displacement impact of the project on neighborhood residents. On October 21, 1980 HUD notified the complainants of the project's approval. The City of Boston and HUD signed a formal UDAG contract in the early months of 1981.

## I. *Threshold Issues*

The federal funding at issue was authorized by the Housing and Community Development Act of 1977, and a threshold issue is the application of the civil rights duties of Title VI (42 U.S.C. § 2000d et seq.) and Title VIII (42 U.S.C. § 3601 et seq.), i. e. of non-discrimination and the promotion of fair housing, to UDAG grants and applicants under that statute, 42 U.S.C. § 5318. Fairly recent amendments to the UDAG regulations, effective on November 11, 1980, leave no doubt as to the relationship between civil rights laws and Urban Development Action Grants. All applicants for grants must certify, 24 C.F.R. § 570.-458(c)(16)(xiv)(A) and (B), that their UDAG projects comply with Title VI of the Civil Rights Act of 1964 and Title VIII of the Civil Rights Act of 1968. The new regulations, 24 C.F.R. § 570.458(c)(12), also specify that information about involuntary displacement of low-income minorities should be submitted.

■ Although the regulations in effect at the time of Copley Place UDAG approval were not as explicit, I rule that the Copley Place UDAG was, and is, subject to the civil rights obligations of Title VI and Title

VIII.[1] "It is clear that anti-discrimination statutes have a significant impact on all federal financial assistance programs." *NAACP v. Wilmington Medical Center*, 426 F.Supp. 919, 923 (D.Del.1977).

The defendants contend, on a second preliminary issue, that these individual plaintiffs do not have private rights of action under Title VI against HUD and the City of Boston, and that therefore they are entitled to summary judgment as a matter of law. Although the Supreme Court has not yet decided whether or not a private right of action exists under Title VI, dictum in *Cannon v. University of Chicago*, 441 U.S. 677, 715–716 n.51, 99 S.Ct. 1946, 1967, n.51, 60 L.Ed.2d 560 (1979), suggests the existence of the implied right, at least against the recipient of federal funds and less possibly against the agency itself. *NAACP v. Medical Center, Inc.*, 599 F.2d 1247, 1254 n.27 and 1259 n.49 (3rd Cir. 1979), states that it is only the recipient of federal funds, in this case the City, that can be sued under Title VI. That holding was predicated on the assumption that "complete relief" could be awarded "without the agency being a party to the private suit." *Id.* The court was satisfied that a recipient could be ordered to cease any discriminatory practice, and that a suit against an agency to compel funding termination would be an impermissible interference with the enforcement scheme of Title VI (42 U.S.C. § 2000d–1). The primary relief sought in the instant case, however, is further HUD study of Copley Place displacement impact, and complete relief cannot be awarded without HUD's presence in the suit. Indeed the gravamen of the complaint is that action against the City alone is not sufficient. Plaintiffs claim that representations concerning Copley Place impact presented by the City of Boston, as the interested potential recipient, should not determine the federal agency's own study of the civil rights aspects of the grant.

1. The legislation creating UDAGs also extended the 1974 Community Development Block Grant program, 42 U.S.C. § 5301 et seq., and that earlier program specifically incorporated Title VI language, 42 U.S.C. § 5309(a).

This is not a case of claimed past discriminatory practice raising the spectre of terminating financial assistance but an action designed to prevent such a practice and to ensure that HUD follows certain procedures. In the first stage of the *NAACP v. Wilmington Medical Center, Inc.* litigation, 426 F.Supp. 919, 925 (D.Del.1977), the court ordered the Secretary to determine whether or not the proposed hospital relocation violated Title VI, and the implied right to sue the Secretary under Title VI for that kind of relief was not challenged on appeal. *See also NAACP Boston Ch. v. Harris*, 607 F.2d 514, 516, 527 (1st Cir. 1979).

This Court, noting that *Schmidt v. Boston Housing Authority*, 505 F.Supp. 988 (D.Mass.1981), and *Harris v. White*, 479 F.Supp. 996, 1002 (D.Mass.1979), are rulings in line with the *Cannon* dictum, assumes for the purpose of these cross-motions for summary judgment that a limited private right of action exists under Title VI against HUD and the City.[2] It is undisputed that a private right of action is central to the Title VIII statutory scheme, 42 U.S.C. § 3610(d), *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 209, 93 S.Ct. 364, 366, 34 L.Ed.2d 415 (1972).

Standing is a third threshold issue and the pertinent question is whether or not the plaintiffs are "suffering tangible harm traceable to the challenged actions of the defendant(s)—harm which will be lessened if the requested remedy is granted." *NAACP, Boston Ch. v. Harris*, 607 F.2d 514 (1st Cir. 1979); *Marie Theriault v. Brennan*, 641 F.2d 28, 31 (1st Cir. 1981). Although a decision on standing in no way depends on the merits of plaintiffs' case, the ruling must be made in the context of, indeed "it often turns on the nature and source of the claim asserted." *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

There are two interrelated claims in this case, one alleges a procedural injury and the other alleges a substantive harm. The plaintiffs assert that prior to the UDAG award HUD failed to study the indirect displacement that low-income residents living in the impact area would suffer as a result of the Copley Place project. They trace this alleged planning failure directly to the conduct of the federal officials responsible for approving the UDAG, and they seek a procedural remedy which would mandate the completion of such a displacement study by HUD. The alleged substantive injury is that the Copley Place UDAG discriminates against low-income minorities residing in abutting neighborhoods by providing critical financial aid for the Copley Place development, which in turn will work to indirectly displace the nearby plaintiffs by triggering increased rents, condominium conversions and threatened evictions. Plaintiffs seek relief which would mitigate the alleged indirect discriminatory displacement impact.

I rule, on the basis of the limited record presently before the Court and for the purpose of these motions only, that plaintiffs' have shown sufficient standing to withstand defendants' motion for summary judgment. The Court emphasizes, however, that it has not resolved or removed the issue of standing from the lawsuit, and the plaintiffs "must continue to carry the burden of proof on standing." *NAACP, Boston Ch. v. Harris, supra* at 527. In subsequent motions and at trial, plaintiffs must prove facts establishing their standing and the Court is mindful of the following concerns.

Establishing "injury in fact" by proving procedural deficiencies may be sufficient to

---

**2.** The analysis of Mr. Justice Stevens in *University of California Regents v. Bakke*, 438 U.S. 265, 419–420 n.26, 98 S.Ct. 2733, 2814 n.26, 57 L.Ed.2d 750 (1978), supports the distinction between an implied cause of action seeking declaratory and injunctive relief and an implied cause of action seeking to implement the administrative enforcement scheme of Title VI, 42 U.S.C. § 2000d–1. "The grant of an injunction

or a declaratory judgment in a private action would not be inconsistent with the administrative program established by Section 602 .... A declaratory judgment or injunction against future discrimination ... would not implicate the concern that led to the limitations contained in Section 602 (42 U.S.C. § 2000d–1)." (Stevens citing government brief) *Id.*

confer standing on plaintiffs in federal court. *Committee For Full Employment v. Blumenthal,* 606 F.2d 1062, 1065 (D.C.Cir. 1979). The First Circuit appears to be of the view, however, that a procedural injury or statutory violation is not sufficient, in and of itself, to establish standing. The procedural "violation must lead to a material harm to the plaintiffs which the court is empowered to relieve." *NAACP, Boston Ch. v. Harris, supra* at 521 (construing *City of Hartford v. Towns of Glastonbury,* 561 F.2d 1032, 1051 (2d Cir. 1977) (en banc).).

It is not enough for the present plaintiffs to allege that HUD failed to properly study the indirect displacement impact of Copley Place on nearby parts of the City. That failure must be tied to material harm to the plaintiffs. The material harm claimed on the present record is economic and emotional harm to the plaintiffs. Affidavits of the plaintiffs show that rent increases have occurred and that they fear threatened evictions and condominium conversions.

█ Even if material harm has occurred or will occur, the plaintiffs still have a burden on the causation and relief dimensions of standing before the merits of a Title VI or Title VIII claim can be reached.

> The fact that the harm to petitioners may have resulted indirectly does not in itself preclude standing ... But it may make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm.
>
> *Warth v. Seldin, supra,* 422 U.S. at 505, 95 S.Ct. at 2208.

The plaintiffs have the burden of demonstrating that the increased rents and threatened evictions are "fairly traceable" to the UDAG funding of Copley Place, and that court-ordered relief can redress the harm. It is arguable that Copley Place, a $318 million project, would have been built even without the $18.85 million UDAG, and

that the South End's ongoing gentrification and displacement of low-income minorities would have continued to accelerate at a significant pace even without any Copley Place project whatsoever. Nevertheless, I am satisfied on the current record that the plaintiffs have sufficiently personalized issues at stake to further litigate the legal claims presently before the Court.

This ruling is made with *NAACP, Boston Ch. v. Harris, supra,* in mind, where the First Circuit analyzed the standing of three groups of plaintiffs in a similar case. The present plaintiffs do not seek standing based on their interest in the issues alone, as the state representatives did in *NAACP, Boston Ch. v. Harris, id.* Nor is this a case where plaintiffs offer mere generalized grievances, i. e., racial tension in the City of Boston interferes with the conduct of their daily lives and the UDAG contributes to such tension. *Id.* These plaintiffs say they face increased rents and threatened evictions. They live in the claimed impact area. Their personal stake in displacement allows them to raise the issue with HUD and City officials.

█ In attacking HUD's study of the civil rights implications of Copley Place, plaintiffs assert that part of HUD's failure lay in its unwillingness to review the City of Boston's general eligibility for UDAG awards. On that particular dimension of the plaintiffs' claims the defendants' position is well taken. The plaintiffs, following *NAACP, Boston Ch. v. Harris, supra,* have no standing to challenge Boston's basic UDAG eligibility. The relief that would flow from a negative finding, cutting off all UDAG aid to Boston, would aggravate the problems that concern the plaintiffs, i. e. the maintenance of whatever decent and integrated housing exists in the City.

## II. *Title VIII and Title VI Claims*

Title VIII, particularly 42 U.S.C. § 3608(d)(5),[3] places an affirmative duty on

---

**3.** 42 U.S.C. § 3608(d)(5): "The Secretary of Housing and Urban Development shall administer the programs and activities relating to

housing and urban development in a manner affirmatively to further the policies of this subchapter."

HUD to promote fair housing opportunities. That duty extends to prospective situations as well as to past or continuing practices in the private and public sector. The Second Circuit held in *Otero v. New York City Housing Authority*, 484 F.2d 422, 1134 (2d Cir. 1973), that 42 U.S.C. § 3608(d)(5) "requires that consideration be given to the impact" of a proposed project "on the racial concentration" in the impact area. *Accord, Marin City Council v. Marin City Redevelopment Authority*, 416 F.Supp. 700 (N.D. Cal.1975).

Title VI, 42 U.S.C. § 2000d et seq., also imposes a duty on HUD, less affirmative but broader ranging than that under Title VIII, designed to eliminate racial discrimination in all federally assisted programs or activities. 24 C.F.R. § 1.7(c) states that HUD "shall make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply" with Title VI.

The issue in this case is whether HUD, in conjunction with the City of Boston, met or failed to meet its duties under Title VI and Title VIII. HUD satisfied its Title VIII duty to promote fair housing if it used an "institutionalized method" to reach an "informed decision," based on "the relevant racial and socio-economic information." *Shannon v. HUD*, 436 F.2d 809, 821 (3rd Cir. 1970). It met its Title VI responsibilities if it conducted the investigation outlined in 24 C.F.R. § 1.7(c). *NAACP v. Wilmington Medical Center*, 426 F.Supp. 919, 924–5 (D.Del.1977).

The defendants contend that the record conclusively establishes that HUD, prior to the UDAG award, carefully and conscientiously considered whether the development of Copley Place would violate the civil rights of minorities. The plaintiffs dispute that fact,,and claim that HUD's study was neither independent nor inclusive of racial concerns. The plaintiffs rely on the administrative record and some supplemental affidavits and two depositions.

 It may well be that the defendants will succeed in establishing the thoroughness and care of their Copley Place impact study, but the Court leaves the determination of that issue to a subsequent motion for summary judgment or a trial. In reviewing the defendants' motion for summary judgment, the Court must look at the record in the light most favorable to the party opposing the motion and give that party the benefit of the doubt on all inferences. *Hahn v. Sargent*, 523 F.2d 461 (1st Cir. 1975). In doing so, I find, on the basis of a limited record, that the nature and extent of HUD's civil rights inquiries concerning the impact of the Copley Place project on low-income minority residents of the neighboring areas presents a genuine issue of material fact.

The administrative record reveals the following. In early 1980 Boston submitted a UDAG application, including assurances of Title VI and Title VIII compliance. Several preliminary observations by HUD officials attest to their awareness of displacement concerns (Record, 189; Record, 195). An administrative complaint was filed by two housing organizations on June 5, 1980, raising civil rights issues concerning the project's indirect displacement. The Deputy Assistant Secretary for Fair Housing and Equal Opportunity was notified of the administrative complaint on June 11, 1980. The City of Boston responded to the complaint on August 25, 1980, and in the meantime the project's developer had forwarded a housing impact study, completed in late 1979 for the City, to HUD (Record, 358).

HUD officials met with the administrative complainants on September 2, 1980, but never responded to the complainants' written request for findings. The most revealing document in the record is a letter dated September 19, 1980, from the Director of the Area's Division of Fair Housing and Equal Opportunity to the Area Manager in charge of Copley Place UDAG review. (Record, 710). It notes that HUD is "extremely concerned about the involuntary displacement of minorities," but observes that no HUD guidelines exist on the issue and that indirect displacement is hard to measure in any event. In the absence of "hard evidence" the report recommends

that "the project not be stopped based on civil rights considerations." The last sentence of the letter declares that "it does not appear that either Title VI or Title VIII will be violated." (Record, 711). No supporting material or explanation is offered.

HUD's record, granting plaintiffs all inferences, is one of reaction and bureaucratic feedback, not of initiative and study. On September 24, 1980, HUD's Area Manager merely reiterated the concerns about the project's "potential negative impact" on low income households that he had voiced in a June 3 letter (Compare Record, 713–716 and Record, 195). Nothing more substantive emerges from the present record. On October 9, 1980, a press release announced the UDAG award.

The defendants contend that the record shows that UDAG regulations were followed, 24 C.F.R. § 570.450 et seq., and that such compliance establishes the "institutionalized method" for an "informed decision" demanded by Title VIII and *Shannon, supra.* That asserted compliance does not, however, entitle defendants to judgment as a matter of law. Mere adherence to the then existing UDAG regulations does not necessarily preclude a Title VIII claim, particularly if the record as it now appears does not clearly establish that HUD had the "relevant racial and socio-economic information" at the time of UDAG approval.

Defendants also assert that even if the June 1980 administrative complaint was a Title VI complaint, and that is disputed, their investigation met the flexible demands of 24 C.F.R. 1.7(c) and therefore no more effort was legally required. Some of the most substantive displacement information on which HUD relied, however, the Housing Impact Study of 1979, antedated the administrative complaint by six months and therefore it could not be considered part of the "prompt investigation" that should have followed the filing of Title VI concerns as outlined by the regulations. Nor, of course, was that study conducted by HUD itself, and it does not appear to have considered the racial dimension of displacement. This Court, on the present record, will not rule that defendants did all that was legally necessary to satisfy Title VI concerns.

In review, the Court declines to grant summary judgment for the defendants or the plaintiffs, on the ground that further exploration of the facts is necessary, and that judgment as a matter of law is unwarranted. *Marin City Council, supra* at 706.

### III. Arbitrary and Capricious Agency Action

█ The third and final claim of plaintiffs is that HUD's funding of Copley Place was arbitrary and capricious agency action, subject to review and relief under 5 U.S.C. § 706(2)(a). The ultimate standard of review under this statute is a narrow one, *Citizens To Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and precludes judicial review on a de novo or even a substantial evidence basis. *King v. Harris,* 464 F.Supp. 827 (E.D.N.Y.1979).

HUD must establish that its decision on Copley Place was based on all relevant information and included the appropriate inquiries. Given the ambiguity of the current record, and the existence of the independent claims, the Court reserves on this claim seeking judicial review. *NAACP v. Medical Center, Inc.,* 599 F.2d 1247, 1259 n.49 (3rd Cir. 1979).

Order accordingly.