NATIONAL ASSOCIATION FOR the AD-
VANCEMENT OF COLORED PEOPLE,
Puerto Rican Civil Rights League, Inc.,
Older Americans Coalition, Wilmington
United Neighborhoods, Brandywine
Trinity United Methodist Church, On
behalf of their members and others sim-
ilarly situated, and Sarah Bratcher, Ray-
mond W. Brown, Maria Galindez, for
herself and as parent and guardian for
her minor children, Reynaldo Galindez,
and Pedro Galindez, Milagro Quinones,
Denise Smokes, Maria Miran, On behalf
of themselves and others similarly situ-
ated, City of Wilmington, Appellants,

v.

The MEDICAL CENTER, INC., David
Mathews, U.S. Secretary of Health, Edu-
cation, and Welfare, Amos Burke, Di-
rector of the Bureau of Comprehensive
Health Planning, William C. Gordon, Di-
rector of the Health Planning Council,
Inc., Appellees.

Nos. 78–1616, 78–1943.

United States Court of Appeals,
Third Circuit.

Argued Jan. 10, 1979.

Decided June 4, 1979.

Marilyn G. Rose (argued), Herbert Sem-
mel, Washington, D. C., Douglas Shacht-
man, Jeffrey S. Goddess, Wilmington, Del.,
for appellants.

Rodney M. Layton (argued), William J.
Wade, Richards, Layton & Finger, Wil-
mington, Del., for appellee· The Wilmington
Medical Center, Inc.

Rebecca L. Ross (argued), Barbara Allen
Babcock, William G. Kanter, Barbara
O'Malley, Washington, D. C., for appellee
Joseph A. Califano, Jr., Secretary of the
Department of Health, Education and Wel-
fare.

William L. Taylor, Roger S. Kuhn, Washington, D. C., for amici curiae, League of Women Voters of the United States, National Urban League, Puerto Rican Legal Defense and Education Fund, Inc., and Women's Legal Defense Fund.

Before HUNTER and GARTH, Circuit Judges, and BROTMAN,* District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

Appellants brought this action under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1976), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1976), contending that a proposed health facility relocation would have a discriminatory impact. The district court directed appellants to pursue the administrative remedy provided by section 602 of Title VI. The court subsequently found that Title VI and section 504 do not create private rights of action to seek declaratory and injunctive relief for violations of the stat-

utes, found that the administrative remedy was the sole remedy available to appellants, and then affirmed HEW's administrative decision that the proposed relocation would not have a discriminatory impact. Because we find that Title VI and section 504 create private rights of action for plaintiffs who seek relief other than funding termination,[1] we reverse and remand the case to the district court for a trial on the merits.[2]

### I.

Appellants are five organizations and six individuals representing minority and handicapped persons who reside in Wilmington, Delaware.[3] Defendants are the Wilmington Medical Center ("WMC"), the Secretary of the United States Department of Health, Education, and Welfare ("HEW"), the Director of the Bureau of Comprehensive Health Planning of Delaware ("BCHP"), and the Chairman of the Health Planning Council, Inc. ("HPC").[4]

This case arises from the controversy surrounding the decision of the Wilmington Medical Center to relocate major tertiary

---

* Honorable Stanley S. Brotman, United States District Judge for the District of New Jersey, sitting by designation.

1. As appellants seek only declaratory and injunctive relief, we need not consider whether a private cause of action for damages is available.

2. This action has already been the object of extensive and protracted discovery. At oral argument counsel committed themselves to expediting the remaining discovery and to compressing the time required to try the merits of appellants' claims. In light of what has already been accomplished by way of discovery, and in reliance on the representations of counsel, we are confident that there will be no delays in bringing this case to an early final decision. These observations are in no way intended to control the district court's discretion in structuring or limiting discovery or other pretrial procedures.

3. The district court granted class certification pursuant to Rule 23(b)(2), Fed.R.Civ.P., and the class was designated as follows:
   1. All black and Puerto Rican residents of Wilmington and other areas of New Castle County who are better served by the existing locations of the Wilmington Medical Center Incorporated ("Medical Center");

   2. All handicapped residents of Wilmington and other areas of New Castle County who are better served by the existing locations of the Medical Center.
   453 F.Supp. 280, 284 (D.Del.1978).

4. WMC is the recipient of federal support which accounts for approximately 35% of its total budget. WMC is sued because it chose an allegedly discriminatory relocation site. The other defendants are all participants in the review process established by § 1122 of the Social Security Act. 42 U.S.C. § 1320a–1 (1976), which is intended to screen capital expenditure proposals for unnecessary expansion. They are charged with violating Title VI and section 504 because they allegedly officially sanctioned a discriminatory proposal by approving it during the course of the section 1122 review. The inclusion of BCHP and HPC raises the issue of whether the rights guaranteed by Title VI and section 504 can be violated by state agencies, even those which are supported in part by federal money, that are simply engaged in the review contemplated by section 1122. The district court, in its opinion on the motion to dismiss, reserved this question. (426 F.Supp. 919, 924). The issue was mooted by the district court's eventual disposition of the case, but may have to be reopened on remand.

care components of its medical system from existing inner-city divisions to an outlying suburban location. Plaintiffs contend that the relocation (pursuant to a proposal denominated "Plan Omega") will cause disparities in the accessibility and quality of medical care available to urban and suburban residents.[5] This action was commenced on September 10, 1976, in the United States District Court for the District of Delaware. Plaintiffs contended that Title VI and section 504 created private causes of action to seek enforcement in federal court of the rights guaranteed by those statutes. They sought: 1) a judgment declaring that the proposed relocation would subject plaintiffs to discrimination in violation of Title VI and section 504 of the Rehabilitation Act; and 2) an injunction against construction of the proposed suburban facilities pending a review by HEW of the compliance of Plan Omega with Title VI and section 504.

On November 3, 1976, HEW filed alternative motions to dismiss or for summary judgment. HEW argued that the Complaint should be dismissed because of plaintiffs' failure to exhaust the administrative remedy provided by section 602 of Title VI. Plaintiffs responded that resort to agency procedures would be futile, alleging that HEW had insufficient resources available to conduct an adequate compliance review.[6]

On January 19, 1977, the district court denied HEW's motion to dismiss plaintiffs' action. Rather, the court directed HEW to treat the plaintiffs' Complaint as "information" sufficient to require HEW to initiate the compliance investigation and review mandated by section 602.[7] In its Opinion of April 7, 1978, affirming HEW's ultimate determination, the district court reviewed its January 19 Order and explained:

> The decision to instruct the Secretary to develop the factual record on plaintiffs' complaint and to exercise his discretion in reviewing Plan Omega, reflected the Court's view that such a process would 'carry out the Congressional expectation that Title VI be administered by the appropriate agency and that judicial review of the agency's decision follow traditional paths.'

453 F.Supp. 280, 290 (D.Del.1978), *quoting* 426 F.Supp. 919, 925 (D.Del.1977).

HEW conducted the ordered compliance review. On July 5, 1977, in a Letter of Findings from its Office of Civil Rights, HEW determined that the relocation proposed by Plan Omega as then formulated would violate Title VI and section 504. The letter also enumerated 12 areas in which the Plan would have to be modified in order to be in compliance with those statutes and with the Secretary's regulations. Subse-

---

**5.** Under Plan Omega, two of WMC's three inner-city divisions would be closed, and the third would be scaled down. Presently, WMC maintains 1,104 beds, which constitute nearly 75% of the acute care beds available in Wilmington and its metropolitan area. As a result of the proposed closing of city divisions under Plan Omega, WMC's inner-city bed capacity would fall from 1,104 beds to 250 beds. A new facility, consisting of 800 beds, would be constructed at a suburban site located about 8 miles southwest of the City.

Plaintiffs assert, *inter alia*, that WMC's remaining inner-city division will become a "ghetto" hospital, that transferred acute care services will be virtually inaccessible, that a segregated dual hospital system will be created, and that the staffing of the inner-city division will suffer qualitatively.

**6.** HEW does not generally conduct Title VI and section 504 compliance reviews of health facility relocations. It is engaged in several such reviews at present, all under court order. HEW has candidly admitted its inexperience

and inadequate staffing in this area. Whether HEW has the resources necessary to engage in compliance review is not critical to this appeal, however, since the plaintiffs now claim, and we agree (*see* n. 10 *infra*), that recourse to the administrative remedy is not in any event a prerequisite to the assertion of the plaintiffs' private cause of action. *See Cannon v. University of Chicago*, —— U.S. ——, —— n. 41, 99 S.Ct. 1946, 1962, 60 L.Ed.2d 560 (1979).

**7.** The district court observed that failure to exhaust administrative remedies normally requires dismissal of the suit. However, HEW regulations call for a Title VI investigation "whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply" 45 C.F.R. § 80.7(c) (1978). Since the Complaint served by the plaintiffs was sufficient "information" to require a Title VI investigation, the court directed HEW to initiate a compliance review. 426 F.Supp. 919, 924 (D.Del.1977).

quently, the Secretary engaged in informal, voluntary efforts to secure the compliance of WMC. After more than three months of discussion HEW and WMC entered into a binding agreement on November 1, 1977, in which WMC agreed to cure those aspects of its proposal which, in HEW's opinion, constituted Title VI and section 504 violations. With this agreement executed, the Secretary concluded that Plan Omega, as modified, was in compliance with the statutes and regulations. Plaintiffs disagreed with the Secretary's conclusion, contending, *inter alia*, that the modified plan was based on erroneous and inadequate findings and was not based on a consideration of the relevant factors. The case was presented to the district court on cross-motions for partial summary judgment filed by the plaintiffs and by HEW, and upon a motion for summary judgment filed by defendant WMC. The court concluded that the cross-motions called for what was essentially judicial review of the Secretary's informal administrative determination that the modified Plan Omega complied with Title VI and section 504.

The court also had before it a motion by plaintiffs to modify its Order of November 4, 1977, in which the court had determined that the scope of its review was to be governed by the arbitrary and capricious standard defined in the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A) (1976). By their motion, Plaintiffs sought judicial review under the trial *de novo* standard of the APA, 5 U.S.C. § 706(2)(F), contending that HEW's determination was "adjudicatory in nature." The court denied this motion. Accordingly, the court applied the arbitrary and capricious standard, and affirmed the Secretary's determination. In the course of its decision, the court found that the administrative remedy provided under section 602 was exclusive, and that, as a result, plaintiffs did not have a private cause of action under Title VI or section 504. Additionally, the court denied plaintiffs' motion to supplement the administrative record under review, and rejected plaintiffs' claim of a due process right to an evidentiary hearing before the agency.[8]

On appeal, plaintiffs first contend that Title VI and section 504 create private causes of action, and that as a result the district court's initial referral of their complaint for administrative action was error.[9] Second, plaintiffs renew their contentions as to the appropriateness of the *de novo* review standard, the right to supplement the administrative record on review, and the right to a due process evidentiary hearing before the agency. Finally, they seek review of the district court's decision to affirm HEW's finding that Plan Omega is in compliance with Title VI and section 504.[10]

## II.

Our analysis of Title VI begins with the language of the statute. Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1976), declares:

**8.** The decision on the due process claim is separately reported at 453 F.Supp. 330 (D.Del. 1978).

**9.** In *Gurmankin v. Costanzo*, 556 F.2d 184 (3d Cir. 1977) we discussed, but were not compelled to decide, the question of whether a private cause of action exists under section 504 and Title VI. Judge Rosenn has collected the authorities which hold that such a cause of action does exist under section 504. *Doe v. Colautti*, 592 F.2d 704 at 708 n. 8 (3d Cir. 1979), *amended* (Feb. 23, 1979). The question is now squarely before us.

**10.** Since we hold that there exists a private cause of action under section 601 of Title VI which may be asserted without preliminary recourse to agency remedial procedures, we need not reach the issue of what the appropriate

agency procedures would be in the absence of such a private action, (i. e., whether there is a right to a due process evidentiary hearing, whether there is a right to supplement the administrative record on review, and what the standard of review of agency action is).

Further, appellants may be aggrieved persons who have the right to seek judicial review of HEW's determination that Plan Omega complies with Title VI and section 504. We do not foreclose that right. However, since we are remanding the issue of Plan Omega's compliance for a full trial on the merits, we will not review HEW's approval of the Plan, or the district court's affirmance of that approval, at this time. Nor must we now decide whether appellants are aggrieved persons within the meaning of section 603 of Title VI.

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

The right established by section 601 is unequivocal, broad, and remedial in nature; in this respect it is quite similar to the later enacted Voting Rights Act, 42 U.S.C. § 1973 *et seq.* (1976) from which the Supreme Court has inferred a private right of action. *Allen v. Board of Elections*, 393 U.S. 544, 556, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).[11]

Section 602 of Title VI,[12] 42 U.S.C. § 2000d–1, directs federal grant making agencies to effectuate the provisions of section 601, provides the administrative mechanism by which government agencies are to take funding termination action, and requires that as a prerequisite to funding termination an agency determine that voluntary compliance cannot be secured. Finally, section 603 of Title VI, 42 U.S.C. § 2000d–2,[13] is a limit on the enforcement mechanism provided by section 602. It provides for judicial review of agency action taken pursuant to section 602.

The principles enunciated by the Supreme Court in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), guide the determination of whether a private remedy is implicit in a statute not expressly providing such a remedy. The relevant factors are:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted, . . . that is, does the statute create a federal right in favor of the plaintiff?

Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?

. . .

**11.** As noted in *Regents of University of California v. Bakke*, 438 U.S. 265, 420–421 n. 28, 98 S.Ct. 2733, 2815 n. 28, 57 L.Ed.2d 750 (1978) (Opinion of Justice Stevens, joined by Justices Burger, Stewart and Rehnquist):

. . . [T]he principle embodied in § 601 involves *personal* Federal rights that administrative procedures would not, for the most part, be able to protect. The analogy to the Voting Rights Act of 1965, 79 Stat. 437, is clear. Both that Act and Title VI are broadly phrased in terms of personal rights ("no person shall be denied . . ."); both Acts were drafted with broad remedial purposes in mind; and the effectiveness of both Acts would be "severely hampered" without the existence of a private remedy to supplement administrative procedures. *See Allen v. State Board of Elections*, 393 U.S. 544, 556, 89 S.Ct. 817, 826, 22 L.Ed.2d 1. In *Allen*, of course, [the Supreme] Court implied a private right of action under the Voting Rights Act. (emphasis in original).

**12.** Section 602 provides, in relevant part:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. . .

Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, . . . or (2) by any other means authorized by law: *Provided, however*, That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means.

. . .

**13.** Section 603 provides:

Any department or agency action taken pursuant to section 2000d–1 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 2000d–1 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with section 1009 of Title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of that section.

Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

. . .

And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? . . .

422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted).

The first and fourth factors are not in dispute. Plaintiffs are members of the class for whose benefit the statutes were enacted.[14] Being beneficiaries of government supported programs and facilities, plaintiffs are clearly "persons" for whose "especial benefit" Title VI and section 504 were enacted. It is the right not to be "excluded from participation in [or to be] denied the benefits of . . . any program or activity receiving Federal financial assistance", "on the ground of race, color, . . . national origin" or handicap, which is the essence of Title VI and section 504, and which plaintiffs are in a position to assert. The fourth question asked in *Cort* —whether the cause of action is one traditionally relegated to state law—is also readily answered. The right of participants in federally funded programs to be free from

unlawful discrimination on account of race or handicap, is preeminently the province of federal, not state, law. The parties below have conceded these issues, the lower court has so concluded, and we concur. The second and third factors present more difficult issues, and upon these factors our decision turns.

Under *Cort*, an explicit statement of congressional intent to deny a private cause of action would preclude our implying such an action. However there is no explicit indication of legislative intent either to create or to deny a private cause of action in the legislative history of Title VI. At best, it may be said that the legislative references to a private cause of action are inconclusive. WMC has directed our attention to statements made on the floor during debate by Congressman Gill[15] and Senators Kuchel[16] and Keating.[17] These statements constitute the clearest evidence of explicit intent that can be adduced.

However, Congressman Gill's comments were apparently directed toward the question of who may go to court to challenge funding termination decisions. Senator Kuchel's comments were directed toward the availability of judicial review for terminated funding recipients. Only Senator Keating was speaking to the issue when he noted in passing that an explicit right to

---

**14.** For example, Representative Celler observed during the congressional debate on Title VI:

The bill would offer assurance that hospitals financed by Federal money would not deny adequate care to Negroes. . . . It would, in short, assure the existing right to equal treatment in the enjoyment of federal funds.

110 Cong.Rec. 1519 (1964).

**15.** "Further, Title VI provides very clearly that the person or the agency which is denied the money, if it desires, can go to the courts . . and that court can determine whether or not the cutoff is in accord with law and whether or not it was properly done under this statute. Nowhere in this section do you find a comparable right of legal action for a person who feels he has been denied his rights to participate in the benefits of Federal funds. Nowhere. Only those who have been cut off can go to court and present their claim." 110 Cong.Rec. 2467 (1964) (remarks of Rep. Gill).

**16.** ". . . [T]he agency aggrieved, which would usually be a state or local government authority which had been recipient of Federal assistance, could secure judicial review of the action taken by the Federal administrator in discontinuing or withholding financial assistance. . . . [A] good case could be made that a remedy is provided for the State or local official who is practicing discrimination, but none is provided for the victim of the discrimination." *Id.* at 6562 (remarks of Sen. Kuchel).

**17.** "Parenthetically, while we favored the inclusion of the right to sue on the part of the agency, the State, or the facility which was deprived of Federal funds, we also favored the inclusion of a provision granting the right to sue to the person suffering from discrimination. This was not included in the bill. However, both the Senator from Connecticut and I are grateful that our other suggestions were adopted by the Justice Department." *Id.* at 7065 (remarks of Sen. Keating).

sue was considered but not included in the bill. This comment on the failure to include an explicit provision for a private action, without more, is not enough to make out a controlling legislative intent to deny a private right. *See e. g., Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Stronger evidence of a purposeful rejection of a private cause of action is required for the court to refuse to consider whether such an action may be implied.[18]

Since we do not find an explicit congressional intent to create or deny a private cause of action, we must proceed to determine if an implicit intent to create or deny such an action can be found in the legislative history of Title VI. The district court canvassed that history and concluded that the implicit intent was to deny a private cause of action. The court arrived at this conclusion after determining that section 602 and section 603 of Title VI are primarily administrative, that section 602 does not allow a private right of action to seek funding termination, and that section 603 provides for only limited judicial review of

agency funding decisions. Whether or not these three determinations are correct, they do not necessarily compel or even support the district court's conclusion that section 601 does not create a private cause of action.

Section 601 was probably the least controversial of these three sections of Title VI.[19] There was little dispute over the correctness of the moral principles embodied in the section, and no dispute over the validity and vitality of the fundamental principles of substantive law which it proclaimed.[20] The debate in Congress turned initially on the appropriateness of using the power of the federal purse as a means of effectuating compliance with the otherwise undisputed direction of section 601.[21] Having determined to use funding termination as an enforcement tool, the controversy then moved to how the funding sanction was to be imposed. Many Congressmen feared an overbroad intrusion by government into the manner in which states and localities could administer programs which were supported in part by federal funds.[22]

**18.** WMC has also argued that congressional intent to deny a cause of action is demonstrated by the fact that Congress did create such rights under Titles II and VII. According to WMC, the failure to do so under Title VI would at least create a "presumption" that no private action was intended for violations of Title VI. However, under both Title II and Title VII Congress provided for rights of action so that the exercise of those rights could be expressly conditioned by certain procedural limitations. The explicit creation of a cause of action so that it may be tied to procedural prerequisites is entirely consistent with the absence of an express provision for a cause of action under Title VI, and does not give rise to any "presumption" that such an action was denied.

**19.** As Senator Ribicoff observed: "The principle of nondiscrimination is so undeniably sound that to my knowledge there has not been one word said in opposition to this principle during the debate on this bill." 110 Cong.Rec. 7064 (1964).

**20.** Members of the House Committee which considered Title VI concluded that, "The policy underlying the enactment of Title VI is so fundamentally correct that there is little need for an additional statement in its behalf. Section 601 concisely announces this policy . . . ." H.R.Rep.No. 914, 88th Cong., 2d Sess., *reprint-*

*ed in* 2 U.S.Code Cong. & Admin.News, pp. 2355, 2391, 2510 (1964). In this regard, Senator Case observed, "I am very frank to state that Section 601, which is a statement of substantive right—[repeating the statute]—means exactly what it is. It does not provide a method of enforcement, by itself; but I suggest that it is complete." 110 Cong.Rec. 5255 (1964).

Similarly, in a colloquy between Senators Humphrey and Talmadge, the undisputed nature of the underlying right was made clear:

Sen. Humphrey: The Constitution requires that citizens of the United States be treated as citizens of the United States.

Sen. Talmadge: That right is enforceable in every court of the land, and the Senator from Minnesota knows it.

Sen. Humphrey: That is correct. The existing law of the land is stated in Section 601. *Id.* at 5254.

**21.** 110 Cong.Rec. 2463 (1964) (remarks of Rep. Whitener); *Id.* at 2464 (remarks of Rep. Poff); *Id.* at 2468 (remarks of Rep. Rodino); *Id.* at 2492 (remarks of Rep. Celler).

**22.** 110 Cong.Rec. 2498 (1964) (remarks of Rep. Selden); *Id.* at 2464 (remarks of Rep. Poff); *Id.* at 2466 (remarks of Rep. Elliott); *Id.* at 2471 (remarks of Rep. Colmer); *Id.* at 2479 (remarks of Rep. Flynt); *Id.* at 6052 (remarks of Sen. Johnston).

Others feared that wholesale funding terminations might follow isolated instances of discriminatory administration.[23] Some felt that funding termination served merely to harm the beneficiaries of the terminated programs, and that, as a result, section 602's enforcement thrust was misguided.[24] There was widespread discomfort with the prospect of arbitrary and capricious determinations emanating from Washington, especially if those orders could be backed by the threat of funding termination. Further, out of a desire to provide procedural fairness to funding recipients whose conduct might be challenged,[25] there was strong sentiment in favor of limiting the role of third parties in the funding termination process by denying them a private cause of action to seek funding termination.

These considerations led to the enactment of sections 602 and 603. Congress was concerned with limiting the power of federal agencies to bring about compliance with section 601, not with limiting private rights under section 601. That sections 602 and 603 are limits on agencies, and not on rights, is repeatedly made clear in the legislative proceedings.[26]

To imply a private cause of action, we must find that such a cause would be consistent with the underlying purposes of the legislative scheme. A private cause of action under Title VI to seek declaratory and injunctive relief is entirely consistent with the legislative scheme. We find it impossible to square the plaintiffs' peripheral role in the section 602 and 603 process with their critical status as protected beneficiaries under section 601, unless section 601 is read to include a right of action distinct from the limitations of sections 602 and 603.[27] The very fact that private parties are normally precluded from advancing their section 601 rights before the administrative agency makes more compelling the implication of a

---

**23.** 2 U.S.Code Cong. & Admin.News 2391, 2474 (1964); 110 Cong.Rec. 6562 (1964) (remarks of Rep. Kuchel); *Id.* at 2463 (remarks of Rep. Whitener); *Id.* 2481 (remarks of Rep. Ryan); *Id.* 5251 (remarks of Sen. Long); *Id.* 5254 (remarks of Sen. Talmadge); *Id.* 6545 (remarks of Sen. Humphrey); *Id.* 7058 (remarks of Sen. Pastore); *Id.* 7067 (remarks of Sen. Ribicoff).

**24.** 110 Cong.Rec. 2490 (1964) (remarks of Rep. Boggs); *Id.* at 2498 (remarks of Rep. Willis).

**25.** *See* 110 Cong.Rec. 2503 (1964) (remarks of Rep. Celler); *Id.* at 12320 (remarks of Sen. Byrd).

**26.** As Senator Case emphatically stated, "I wish to make clear that the words and provisions of section 601 and the substantive rights established and stated in that section are not limited by the limiting words of section 602." 110 Cong.Rec. 5254 (1964). *See Id.* at 6562 (remarks of Senator Kuchel); *Id.* at 5254 (remarks of Senator Humphrey).

There were two concerns embodied in section 601—that discrimination existed and that such discrimination was being funded by the United States government. (See, e. g., 110 Cong.Rec. 2468 (1964) (remarks of Rep. Rodino)). That congressional debate focused on the second issue should not obscure the fact that, while not incidental, the funding issue was subordinate to the broader principle being established.

**27.** Within the legislative scheme, a beneficiary may trigger an agency investigation under section 602, and may, under appropriate circum-

stances, petition for review of an agency determination. *See Cannon v. University of Chicago,* —— U.S. ——, —— n. 41, 99 S.Ct. 1946, 1962, 60 L.Ed.2d 560 (1979). But a beneficiary may not otherwise sue an agency under section 601 to compel termination of funds. Additionally, we now hold that a beneficiary may sue a recipient of federal funding under section 601 for a judicial declaration that the recipient's conduct is in violation of section 601. Such an action would allow the beneficiary to vindicate his section 601 rights without invoking the executive's power to terminate funds. (If the trial court finds that the recipient is violating section 601, it may order the recipient to cease the discriminatory practice. Alternatively, the recipient may decline federal funding and escape Title VI's jurisdictional predicate.)

It follows that the beneficiary may not sue the administrative agency under section 601. If the beneficiary were allowed to do so, it would be able to circumvent the limitations of sections 602 and 603, and would be in a position to, in essence, compel funding termination—which is an impermissible result. This conclusion is in harmony with our analysis of the legislative scheme. It does no harm to beneficiaries' rights, as complete relief can be awarded without the agency being a party to the private suit, and complete discovery can be undertaken, since the agency has no more relevant information to impart than does the funding recipient, who is a party.

private remedy under Title VI. As the Supreme Court has noted, when there is a legal right without a legal remedy, the right has little meaning. *Sullivan v. Little Hunting Park,* 396 U.S. 229, 238, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *Jones v. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

The question arises why Congress would explicitly provide for a funding termination sanction, yet leave the remainder of the enforcement scheme to inference. The answer appears to be that at the time of the passage of Title VI, the power of the executive to terminate funding, and the principles which served to limit that power, were subject to intense dispute.[28] Having established a principle of non-discrimination based on the jurisdictional predicate of government funding, Congress was compelled to make explicit how federal power to terminate funding could and should be exercised.[29] That Congress would feel the need to define explicitly the outlines of funding termination does not support the conclusion that funding termination was somehow intended to be an exclusive remedy. The notion that a private action for injunctive or declaratory relief is inconsistent with a federal statute that authorizes termination of funds has been rejected by the Supreme Court.[30] *See Rosado v. Wyman,* 397 U.S. 397, 420, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).

It is also persuasive evidence of intent that Congress has repeatedly enacted attorneys' fee legislation implicitly predicated on the fact that Title VI may be enforced in a private action.[31] While this legislation does not amount to a conclusive demonstration that a private cause of action exists, the fact that Congress has explicitly provided for attorneys' fees under Title VI, coupled with the fact that Congress has had the opportunity to foreclose a private action but has not done so,[32] supports our interpretation of legislative intent and our construction of the legislative scheme envisaged by the enacting Congress.[33]

---

**28.** Much of the dispute turned on whether President Kennedy had actually favored or opposed Congress granting the President wide discretion to order funding termination. *See* 110 Cong.Rec. 2463 (1964) (remarks of Rep. Whitener); *Id.* at 2464 (remarks of Rep. Poff); *Id.* 5253 (remarks of Sen. Humphrey); *Id.* 6048 (remarks of Sen. Talmadge); *Id.* at 5090 (remarks of Sen. Robertson).

**29.** 110 Cong.Rec. 2468 (1964) (Rep. Celler, identifying the need to "clarify and confirm" the executive power); *Id.* at 7067–68 (remarks of Sen. Pastore).

**30.** The application of this principle to Title VI was addressed by four members of the Supreme Court in *Bakke.* Justice Stevens (joined by Justices Burger, Stewart and Rehnquist) quoted with approval the *amicus* brief submitted by the government, in which the government argued:

"[T]he grant of an injunction or a declaratory judgment in a private action would not be inconsistent with the administrative program established by section 602. . . . A declaratory judgment or injunction against future discrimination would not raise the possibility that funds would be terminated, and it would not involve bringing the forces of the Executive Branch to bear on state programs; it therefore would not implicate the concern that led to the limitations contained in Section 602."

Supplemental Brief at 30 n.25, *quoted in, Regents of University of California v. Bakke,* 438 U.S. 265, 288 n. 26, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978).

**31.** See, e. g., Civil Rights Attorneys' Fee Award Act of 1976, 42 U.S.C. § 1988 (1976) (explicitly including actions under Title VI); Section 718 of the Emergency School Aid Act of 1972, 20 U.S.C. § 1617 (1978) (explicitly including actions under Title VI as they pertain to elementary and secondary education, where the legal proceeding is "necessary to bring about compliance").

**32.** The Civil Rights Attorneys' Fee Award Act of 1976 was enacted after several reported decisions (*Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *Bossier Parish School Board v. Lemon,* 370 F.2d 847 (5th Cir.), *cert. denied,* 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967)) had held or assumed that Title VI provided a private cause of action. While the Attorneys' Fee Act was not intended to create any new causes of action, it is unlikely that Congress would have explicitly included Title VI unless it approved such actions.

**33.** The executive agencies have also adopted the position that Title VI creates a private cause of action. In the *amicus* brief in *Bakke;* in recent oral argument before the Supreme Court in *Cannon v. University of Chicago,* No. 77–926, January 9, 1979, *reported in* 47 U.S.

Our analysis of Title VI is supported by prior judicial interpretation. "To date the courts, including [the Supreme Court], have unanimously concluded or assumed that a private action may be maintained under Title VI." *Regents of University of California v. Bakke,* 438 U.S. 265, 419, 98 S.Ct. 2733, 2814, 57 L.Ed.2d 750 (1978) (Justice Stevens, joined by Justices Burger, Stewart and Rehnquist) (footnote omitted). In *Lau v. Nichols* the Supreme Court held that failure to provide language instruction to non-English speaking children of Chinese ancestry was a violation of Title VI. In the case now before us, the district court, recognizing that *Lau* was brought under § 1983, distinguished *Lau* as merely assuming, but not actually deciding, that Title VI created a private cause of action. This overlooks the fact that, in finding that the plaintiffs' "right to participate" had been violated, the Court firmly based its decision on Section 601.[34] Further, this case has been read consistently by the courts as authority for the proposition that Title VI creates a private cause of action. *See Lloyd v. Regional Transport Authority,* 548 F.2d 1277 (7th Cir. 1977); *Gurmankin v. Costanzo,* 556 F.2d 184 (3d Cir. 1977) (dicta).

In *Bossier Parish School Board v. Lemon,* 370 F.2d 847 (5th Cir.), *cert. denied,* 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967), the panel expressly found that Title VI created a private cause of action. While *Lau* had emphasized the contractual agreement between a federal agency and a federal funding recipient as the basis for importing section 601's proscription to the funding recipient, the court in *Bossier* found a Title VI cause of action distinct from any "contract" action which might arise. Merely by accepting federal support the School Board became "bound" by section 601 and *"obligated* to provide [benefits] without racial discrimination." 370 F.2d at 851 (emphasis in the original). The court concluded:

The defendants argue that this section [601] is a mere statement of policy, and that section 602's administrative remedies are the only means by which it may be enforced. Section 601 states a reasonable condition that the United States may attach to any grant of financial assistance and may enforce by refusal or withdrawal of federal assistance. But it also states the law as laid down in hundreds of decisions, independent of the statute. In this sense, the section is a prohibition, not an admonition. In the absence of a procedure through which the individuals protected by section 601's prohibition may assert their rights under it, violations of the law are cognizable by the courts.

370 F.2d at 852.

The most recent Supreme Court consideration of Title VI supports our conclusion. Immediately prior to the filing of this opinion, the Supreme Court announced its decision in *Cannon v. University of Chicago,* — U.S. ——, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). In *Cannon,* the Supreme Court was not called upon to decide whether a private cause of action could be implied under Title VI, but rather whether such an action could be implied under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 *et seq.* Since Title IX was expressly intended by Congress to track the previously enacted Title VI,[35] it was neces-

L.W. 3471 (January 16, 1979); and in the HEW brief before this Court, the argument has been consistently advanced that Title VI provides a private cause of action for enforcement of statutory rights. We attach importance to this position because it indicates that a private cause is consistent in practice with an administrative remedy, and, hence, with the legislative scheme.

**34.** The Court stated: "We do not reach the Equal Protection Clause argument which has been advanced but *rely solely on Section 601*

. . . *to reverse* the Court of Appeals. 414 U.S. at 566, 94 S.Ct. at 788. (emphasis added)

**35.** The Supreme Court noted that:

Title IX was patterned after Title VI of the Civil Rights Act of 1964. Except for the substitution of the word "sex" in Title IX to replace the words "race, color, or national origin" in Title VI, the two statutes use identical language to describe the benefited class. Both statutes provide the same administrative mechanism for terminating federal financial support for institutions engaged in prohibited discrimination.

sary for the Court to determine what remedies Congress thought Title VI provided before it could decide what remedies Congress intended under Title IX. Accordingly, in *Cannon,* the Court did not consider whether Title VI actually created a private cause of action, but rather whether Congress thought that this was so, eight years later, when it modeled Title IX's remedies on those available under Title VI.[36]

Developments subsequent to the enactment of Title VI which the Supreme Court thought might have influenced or impressed Congress at the time of Title IX's enactment were: the numerous decisions of the federal courts after 1964 explicitly finding a private cause of action under Title VI;[37] the decisions of the Supreme Court which implicitly recognized the existence of such actions;[38] the inclusion of Title VI in such attorneys' fees acts as § 718 of the Emergency School Aid Act of 1972;[39] the debates on § 718, Title IX, and the other Titles of the Educational Amendments of 1972;[40] the "Executive Branch's apparent understanding of Title VI at the time" of Title IX's passage;[41] and Congress' apparent "acquiescence" in and "affirm[ation]" of the assumption that a private cause of action existed.[42]

The Supreme Court, in *Cannon,* concluded that in 1972 Congress *believed that it had created* a private right of action under Title VI.[43] We have concluded that Congress *intended* that there be a private right of action when it enacted Title VI in 1964. The reasoning of the Supreme Court supports our conclusion, for the post-enactment treatment of Title VI by Congress is persuasive evidence of what the Congressional intent was at the time of that Title's passage. The unusual manner in which the Supreme Court was called upon to discuss Title VI barred it from making any explicit determination as to whether that Title actually created a private cause of action. However, the Court's discussion of Title VI indicates to us that were this question before it, the answer would be in the affirmative.[44] In the same vein, in *Bakke* four Justices expressed the opinion that there is a private cause of action under Title VI, 438 U.S. at 418, 98 S.Ct. at 2814, while four

—— U.S. ——, 99 S.Ct. 1956 (footnotes omitted).

**36.** "Neither statute expressly mentions a private remedy for the person excluded from participation in a federally funded program. The drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years." *Id.* (footnotes omitted).

**37.** —— U.S. ——, 99 S.Ct. 1946. *E. g. Bossier Parish School Board v. Lemon,* 370 F.2d 847 (5th Cir.), *cert. denied,* 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967).

**38.** 47 U.S.L.W. 4554. *E. g., Allen v. Board of Elections,* 393 U.S. 544, 556, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); *Sullivan v. Little Hunting Park,* 396 U.S. 229, 238, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969).

**39.** —— U.S. at ——, 99 S.Ct. 1946 n. 25, 26, 27.

**40.** —— U.S. at ——, 99 S.Ct. 1946.

**41.** —— U.S. at ——, 99 S.Ct. 1946.

**42.** —— U.S. at ——, 99 S.Ct. 1946.

**43.** "We have no doubt that Congress intended to create Title IX remedies comparable to those available under Title VI and that it understood

Title VI as authorizing an implied private cause of action for victims of the prohibited discrimination." —— U.S. ——, 99 S.Ct. at 1961 (footnotes omitted).

**44.** This is especially so because of the manner in which the respondents in *Cannon* cast their argument. Proceeding from the premise that Title IX and Title VI should receive the same construction, they challenged the construction of Title VI by which a private right of action is implied. While the Supreme Court noted that this argument did not address the question of what Congress believed Title VI to mean, (which was the controlling issue), the Court went on to discuss the respondent's challenges on the merits. 47 U.S.L.W. at 4557. The Court concluded that the express provision for private actions under Titles II and VII of the Civil Rights Act of 1964 did not preclude the inference that such an action was intended under Title VI as well. *Id.* Further, the Court rejected the argument that comments of Representative Gill, and Senators Kuchel and Keating, during Congressional debate, indicated an explicit Congressional intent to deny a private right of action. *Id.* at 4558, 4559. Thus, the Supreme Court has rejected two contentions which were central to WMC's argument on appeal.

other Justices assumed that there was a private cause of action without deciding the question, 438 U.S. at 341, 98 S.Ct. at 2745 and 438 U.S. at 327, 98 S.Ct. at 2768.[45]

## III.

Our holding that there is a private cause of action under Title VI compels a similar holding in respect to section 504 of the Rehabilitation Act of 1973,[46] 29 U.S.C. § 794 (1976). Section 504 is virtually identical to Title VI and was consciously intended by Congress to track that statute.[47] More than in the case of Title VI, the legislative history of the Rehabilitation Act Amendments of 1974, Pub.L. 93–516, 88 Stat. 1617, evidences an explicit Congressional intent to create a private cause of action.[48] As stated in the Committee Report to the Senate, the legislature anticipated that a private right of action would be available as a means of enforcing section 504:

**45.** Justice White, the sole Justice in *Bakke* to deny the existence of a private right of action, questioned the practical effect of finding such a cause:

If private suits to enjoin conduct allegedly violative of § 601 were permitted, recipients of federal funds would be presented with the choice of either ending what the court, rather than the agency, determined to be a discriminatory practice within the meaning of Title VI or refusing federal funds and thereby escaping from the statute's jurisdictional predicate. This is precisely the same choice which would confront recipients if suit was brought to cut off funds. Both types of actions would equally jeopardize the administrative processes so carefully structured into the law.

46 U.S.L.W. at 4927 (footnote omitted). However, the administrative process provided in section 602 was not intended to insulate a federal funding recipient from making hard choices as to whether it would accept funding termination as a cost of continuing to discriminate. Rather, the section 602 limit was intended to protect the recipient from making such choices at the insistence of an unfettered federal grant making agency. If under the threat of a private suit, a recipient were to decide to *decline* federal money (or more likely to cease discriminatory practices) the rights established by section 601 would be vindicated without the exercise of federal executive power, and the concern which prompted Congress to enact sections 602 and 603 would not arise.

**46.** Section 504 provides:

This approach to implementation of Section 504, which closely follows [Title VI], would ensure administrative due process (right to hearing, right to review), provide for administrative consistency within the Federal government as well as relative ease of implementation, and *permit a judicial remedy through a private action.* (Emphasis supplied).

S.Rep.No. 93–1297, 93 Cong., 2d Sess. 39–40, *reprinted in* 4 U.S.Code Cong. & Admin. News, pp. 6373, 6391 (1974).

We agree with the *Cort* analysis of section 504 undertaken in *Lloyd v. Regional Transportation Authority,* 548 F.2d 1277, 1284–86 (7th Cir. 1977), in which the court found an explicit congressional intent to create a private action and concluded that such an action was consistent with the underlying purposes of the legislative scheme. This Court relied on *Lloyd* in *Gurmankin v. Costanzo,* 556 F.2d 184 (3d Cir. 1977), when it supported, in dicta, the holding we make

No otherwise qualified handicapped individual in the United States, as defined in section 706(6) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

**47.** As the Senate Labor and Public Welfare Committee noted, "Section 504 was patterned after, and is almost identical to, the antidiscrimination language of section 601 [of Title VI]. . . . The section therefore constitutes the establishment of a broad government policy that programs receiving Federal financial assistance shall be operated without discrimination on the basis of handicap." S.Rep.No. 93–1297, 93 Cong., 2d Sess. 39–40, *reprinted in* 4 U.S.Code Cong. & Admin.News, pp. 6373, 6390 (1974).

**48.** The 1974 Amendments were enacted to clarify the 1973 Act, and should be accorded great weight when interpreting Congressional intent. *See Red Lion Broadcasting Co. v. FTC,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

It should be noted that the fact that Congress intentionally modelled Section 504 after Title VI and the fact that its history shows an explicit intent to include a private cause of action strengthens our conclusion that a private cause of action was contemplated as a natural part of Title VI as well.

today, and reached the same conclusion, without discussion, in *Doe v. Colautti,* 592 F.2d 704 at 708 n. 8 (3d Cir. 1979), *amended* (Feb. 23, 1979).

## IV.

We hold that under the principles enunciated in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), a private cause of action is implicit in section 601 of Title VI and section 504 of the Rehabilitation Act of 1973 for plaintiffs who seek declaratory and injunctive relief. Because we find that both statutes do create private causes of action for the benefit of the classes protected by the respective statutes, and because we find that these plaintiffs have not had an opportunity to try their cause in federal court, we remand the case to the district court for a trial on the merits of plaintiffs' section 601 and section 504 claims against WMC.[49]

---

**49.** As noted in footnote 27, HEW cannot be a defendant in the suit on the private cause of action. To the extent that it has been named as a defendant and treated as a defendant for the purposes of the private suit, the action against it should be dismissed. HEW remains a party to the petition for judicial review, but that action will, under our disposition (see fn. 10), be reserved pending the outcome of the trial on the merits on remand.

